OPINION OF THE COURT
Hancock, Jr., J.
Claimants, inmates in a State correctional facility, seek damages from the State for unlawful confinement and loss of privileges resulting from the prosecution of disciplinary charges against them. Their appeals from an order affirming the dismissal of their claims present a common issue: whether the State is immune from liability for the actions of employees of the Department of Correctional Services in commencing and conducting formal disciplinary proceedings. We hold that where, as here, the employees act under the authority of and in full compliance with the governing statutes and regulations (Correction Law §§ 112, 137; 7 NYCRR parts 250-254), their actions constitute discretionary conduct of a quasi-judicial nature for which the State has absolute immunity (see, Tarter v State of New York, 68 NY2d 511; Tango v Tulevech, 61 NY2d 34).
I
On February 13, 1985, claimant Arteaga was confined to a cell and charged in a misbehavior report with conspiracy to escape from the Great Meadow Correctional Facility and with possession of a weapon found in the soap factory warehouse where he worked. Following a timely Superintendent’s hearing, the Hearing Officer found Arteaga guilty and imposed a punishment of 90 days in the special housing unit or in keeplock status and the loss of certain privileges. It appears from the record that the charge was based, in part, on a statement of a confidential informant made to the officer who filed the misbehavior report. On administrative appeal, the Department of Correctional Services reversed for lack of substantiating evidence and the proceeding against claimant *215 Arteaga was terminated. For reasons of safety and to preserve the "viability” of the informant, his testimony was not presented on the appeal.
Claimant Treacy, while an inmate at Great Meadow on October 13, 1983, was charged with possession of escape paraphernalia and contraband. He was confined to his cell pending a Superintendent’s hearing after which he was found guilty, given 180 days in special housing and deprived of six months’ good behavior allowance. It appears that the misbehavior report was based in part on escape paraphernalia found in the prerelease room where Treacy worked and on information from a confidential informant who had identified claimant from a photograph as an inmate involved in an escape plan. The Department Review Board affirmed the Superintendent’s disposition on administrative appeal. Subsequently, after claimant Treacy commenced a CPLR article 78 proceeding challenging the determination, the Commissioner reversed the disposition administratively, restored claimant’s good behavior allowance, and expunged references to the charge from his records.
After the dismissal of the proceedings against them, claimants — contending that the sanctions imposed had been unlawful — commenced separate damage actions in the Court of Claims pleading causes of action for malicious prosecution, false imprisonment, and violation of statutory rights. Claimant Treacy also included a cause of action for negligent investigation. The Arteaga court dismissed that action on motion as barred by the doctrine of sovereign immunity. In Treacy, the court granted a dismissal but did so without addressing the question of immunity (131 Mise 2d 849). It found no legal basis for any of the causes of action because of claimant’s status as an inmate and the fact that his confinement followed a Superintendent’s hearing held in accordance with departmental regulations. In a consolidated appeal, the Appellate Division unanimously affirmed, adverting to the broad discretion vested by the Legislature in the Department of Correctional Services in the disciplining of inmates and holding that such activity is not one "with regard to which the State has waived its sovereign immunity” (125 AD2d 916, 917). We granted leave to appeal and now affirm for the reasons which follow.
II
With the enactment of the Court of Claims Act §8, the *216 State waived that immunity which it had enjoyed solely by reason of its sovereign character (see, Weiss v Fote, 7 NY2d 579, 585-586; Bernardine v City of New York, 294 NY 361). While assuming liability under the rules applicable to corporations and individuals for the actions of its officers and employees in the everyday operations of government (see, e.g., Wingerter v State of New York, 79 AD2d 817, affd 58 NY2d 848; McCrink v City of New York, 296 NY 99; Bernardine v City of New York, supra), the State retained its immunity for those governmental actions requiring expert judgment or the exercise of discretion (see, Friedman v State of New York, 67 NY2d 271; Weiss v Fote, supra). This immunity, we have held, is absolute when the action involves the conscious exercise of discretion of a judicial or quasi-judicial nature (see, Tarter v State of New York, 68 NY2d 511, supra; Tango v Tulevech, 61 NY2d 34, supra).
The absolute immunity for quasi-judicial discretionary actions is founded on public policy and is generally said to reflect the value judgment that the public interest in having officials free to exercise their discretion unhampered by the fear of retaliatory lawsuits outweighs the benefits to be had from imposing liability (see, Rottkamp v Young, 21 AD2d 373, 376, affd 15 NY2d 831; Gregoire v Biddle, 177 F2d 579 [2d Cir], cert denied 339 US 949; 2 Harper and James, Law of Torts § 29.10, at 1641). Not all discretionary actions, however, are accorded absolute immunity (see, Tarter v State of New York, supra, at 519).
Whether an action receives only qualified immunity, shielding the government except when there is bad faith or the action taken is without a reasonable basis (see, e.g., Friedman v State of New York, supra, at 283-285; Southworth v State of New York, 62 AD2d 731, affd 47 NY2d 874; Weiss v Fote, supra, at 585, 587; Ufnal v Cattaraugus County, 93 AD2d 521, 524-525) or absolute immunity, where reasonableness or bad faith is irrelevant (see, Tango v Tulevech, supra, at 42), requires an analysis of the functions and duties of the particular governmental official or employee whose conduct is in issue (see, Tarter v State of New York, supra, at 518-519). The question depends not so much on the importance of the actor’s position or its title as on the scope of the delegated discretion and whether the position entails making decisions of a judicial nature — i.e., decisions requiring the application of governing rules to particular facts, an "exercise of reasoned judgment which could typically produce different acceptable results” *217 (Tango v Tulevech, supra, at 41; see, Tarter v State of New York, supra, at 518-519).
Thus, in Tarter, in evaluating the functions of the Board of Parole under Executive Law article 12-B, we concluded that parole release decisions were "classically judicial” in nature and deserving of full immunity (68 NY2d, supra, at 518). Similarly, we have held that the discretionary action of a county probation officer in making a judgment concerning custody of a child (Tango v Tulevech, supra), the acts of correction officials and parole supervisors in establishing the level of restrictions on and the degree of supervision for a released inmate (Eiseman v State of New York, 70 NY2d 175, 184), and the decision of a building inspector in refusing to grant a building permit (Rottkamp v Young, 15 NY2d 831, supra) sufficiently evinced the attributes of judicial decision making to merit full immunity (see also, Santangelo v State of New York, 101 AD2d 20, 28-29 [determination of the Temporary Release Committee and the Superintendent of correctional facility granting a weekend furlough warranted quasi-judicial immunity]; Schanbarger v Kellogg, 35 AD2d 902, appeal dismissed 29 NY2d 649, cert denied 405 US 919 [District Attorney’s action in prosecuting crime entitled to quasi-judicial immunity]).[1]
We next consider the application of these principles to the correction officers involved in the investigation and prosecution of the charges against claimants.
III
To carry out the "formidable tasks” of maintaining order and security in correctional facilities and protecting the safety of inmates and employees, the Legislature has granted the Commissioner of Correctional Services broad discretion in the formulation and implementation of policies relating to security and to the disciplining of inmates (Matter of Rivera v Smith, 63 NY2d 501, 513). Pursuant to this grant of authority *218 (Correction Law §§ 112, 137), the Commissioner has adopted detailed Procedures for Implementing Standards of Inmate Behavior (7 NYCRR parts 250-254) which include rules and regulations pertaining specifically to the filing and content of reports of misbehavior (§§251-1.4, 251-3.1), confinement of inmates (§ 251-1.6), requirements for timely hearings (§ 251-5.1), the designation of authorized Hearing Officers (§253.1), and procedures for conducting Superintendent’s hearings (part 254). There is no question that the officers and employees responsible for filing the misbehavior reports against claimants, conducting the hearings, and confining them before and after the hearing determinations acted entirely within their authority and in compliance with the applicable rules and regulations. The question is whether their actions involved the exercise of discretion of a quasi-judicial nature.
In filing a report of misbehavior (§251-1.4), confining an inmate to his cell or housing area when there are reasonable grounds to believe that the inmate represents an immediate threat to the safety, security, or order of the facility (§251-1.6), and in conducting hearings, the officers and employees of the department are enjoined, as they are with any disciplinary action, to follow the general policies on discipline of inmates (§250.2). These statements of policy express the general departmental philosophy on discipline and include basic guidelines and directives to the effect that disciplinary action must not be overly severe (§ 250.2 [e]), must be administered "in a completely fair, impersonal and impartial manner” (§250.2 [d]), be appropriately varied to fit such factors as the particular circumstances involved, the behavior pattern of the inmate and the present atmosphere of the facility (§ 250.2 [b] [1], [2], [3]), and must be taken only to the extent necessary to regulate an inmate’s behavior within acceptable limits (§ 250.2 [c] [1]) and to "assist in achieving compliance by the entire inmate population with required standards of behavior” (§ 250.2 [c] [2]). In these departmental rules and regulations (7 NYCRR parts 250-254), it is evident that the Commissioner has made an extensive delegation of his statutory authority relating to security, discipline, and inmate behavior to the employees and officers present in the facilities. It is to them that the day-by-day responsibility for such matters is entrusted.
Because of the problems of maintaining security and discipline within correctional facilities, the discretion delegated to the employees and officers is necessarily comprehensive and *219 calls for the exercise of judgment under widely varying conditions. What, if any, disciplinary action to take in a given situation is a matter requiring consideration of broad policies and general objectives in the application of the governing rules and regulations to the particular circumstances. Where some correction officers might think it necessary to confine an inmate, others, because they considered the infraction to be less serious or evaluated the inmate’s behavior pattern differently, could reasonably conclude otherwise. Similarly, what some Hearing Officers might regard as barely enough proof to warrant a finding of guilt in a Superintendent’s hearing, others might reasonably reject as insufficient.
Like the decisions of the Board of Parole in Tarter v State of New York (supra), and of the probation officer in Tango v Tulevech (supra), the actions of Correction Department employees in preparing and filing misbehavior reports, confining inmates, and making dispositions following Superintendents’ hearings entail discretionary decisions in furtherance of general policies and purposes where the exercise of reasoned judgment can produce different acceptable results (see, Tango v Tulevech, supra, at 41). We conclude, then, that actions of correction employees, in circumstances such as those here, are quasi-judicial in nature and deserving of absolute immunity. In carrying out their duties relating to security and discipline in the difficult and sometimes highly stressful prison environment, correction employees, like other officials with quasi-judicial responsibilities, should not be inhibited because their conduct could be the basis of a damage claim (see, Tarter v State of New York, supra, at 518; Butz v Economou, 438 US 478, 514).
We cannot accept the view of the dissent that actions of correction officers "are comparable to the actions of police officers, who under established law are entitled only to qualified immunity.” (Dissenting opn, at 222.) The duties of police officers and the correction officers involved here are not comparable in the nature of their functions, their role in society, or in the underlying policy considerations. Correction officers, unlike police officers, are responsible "for the safety, security and control of correctional facilities” (Correction Law § 137 [2]) in the tense environment of prisons, where proper discipline is essential for the maintenance of order and control. In determining whether there are reasonable grounds to believe that an inmate represents an immediate threat to the safety, security or order of the facility (7 NYCRR 251-1.6) and that *220 they should, therefore, confine the inmate for up to three days, correction officers fulfill a role that is in a sense judicial. In investigating, preparing, and reviewing reports of misbehavior, weighing evidence, and deciding whether to institute disciplinary proceedings (7 NYCRR 251-1.4, 251-2.2) they perform duties which are essentially prosecutorial.
Because of the unquestioned risks to inmates, employees, and the public from a breakdown in order and discipline in correctional facilities and the potentially tragic consequences of such occurrences (see, Jones v State of New York, 33 NY2d 275, 280), it is particularly important that correction officers not be dissuaded by the possibility of litigation from making the difficult decisions which their duties demand. Nor should correction personnel acting as reviewing officers feel reluctant to reverse hearing determinations because doing so might expose the State to liability. These policy considerations dictate the need for quasi-judicial immunity for correction officers who must maintain control and security in the closed setting of a correctional facility where inmates are involuntarily confined by decree of the State. These same considerations do not exist for police officers who ordinarily have neither the duty nor the authority to exert control or discipline over the people in society at large, where the right of the individual to be free from unwarranted police regulation and interference is fundamental.[2]
There is no basis for the contention that giving full immunity to the conduct of correction employees in taking authorized disciplinary measures will deprive inmates of all rights to recover damages against the State in the Court of Claims (Correction Law § 24 [2]) for unlawful actions of employees taken beyond their authority or in violation of the governing rules and regulations (see, Riviello v Waldron, 47 NY2d 297, 303; Cepeda v Coughlin, 128 AD2d 995, 996, 997; see also, *221 Della Pietra v State of New York, 71 NY2d 792). Thus, actions of correction personnel in physically abusing inmates (see, Correction Law § 137 [5]) or in confining them without granting a hearing or other required due process safeguard (see, 7 NYCRR 251-5.1; parts 252-254) would not receive immunity (cf., Wilkinson v Skinner, 34 NY2d 53 [cause of action stated where an inmate was maliciously placed in segregated confinement without any hearing and in violation of his constitutional rights]). In addition, although inmates are precluded by statute from suing Correction Department employees in their personal capacity in State courts (see, Correction Law § 24 [1]; Cepeda v Coughlin, supra), they may, contrary to claimants’ assertion, bring actions in Federal court pursuant to 42 USC § 1983 where correction officers have violated their constitutional rights (see, Redding v Fairman, 717 F2d 1105 [7th Cir], cert denied 465 US 1025; Chavis v Rowe, 643 F2d 1281 [7th Cir], cert denied sub nom. Boles v Chavis, 454 US 907; Mary & Crystal v Ramsden, 635 F2d 590 [7th Cir]; cf., Freeman v Rideout, 808 F2d 949 [2d Cir]).
Accordingly, the order of the Appellate Division should be affirmed.

. Schanbarger v Kellogg (37 NY2d 451, cited in the dissenting opn, at 226) and Jones v State of New York (33 NY2d 275, cited in the dissenting opn, at 225) both deal with actions of police officers. Because the claims based on police misconduct involve different considerations and are not analogous to claims based on the actions of correction officers, neither Schanbarger nor Jones is in point. We have cited a different Schanbarger decision (35 AD2d 902) simply for the proposition that both the Assistant District Attorney and the medical examiner were performing quasi-judicial functions and, as such, entitled to absolute immunity.

. Despite the dissent’s attempts to distinguish our decisions in Eiseman, Tarter, and Tango (see, dissenting opn, at 226), it does not suggest that our decision is inconsistent with the general rule stated in Tango v Tulevech: that "discretionary or quasi-judicial acts involve the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result” (61 NY2d 34, 41). In addition, the dissent’s statement that these cases are not controlling because they involved negligence claims (dissenting opn, at 226), fails to recognize that Tarter v State of New York restated the well-settled principle that absolute immunity protects quasi-judicial decisions even when tainted by improper motives or malice (68 NY2d 511, 518; Murray v Brancato, 290 NY 52, 55).